This appellant was found guilty by a jury of a violation of the Alabama Uniform Controlled Substances Act, in that he was in possession of cocaine, for which the jury assessed a fine of $15,000. At a duly conducted sentencing hearing, after appropriate notice was given by the State that the State would proceed against him under the Habitual Felony Offender Act, the court fixed punishment at imprisonment for forty years and sentenced defendant accordingly.
The appellant is represented by the same attorney who represented him on the trial of the case, who has filed a brief in behalf of appellant, by which he seeks to reverse the judgment of conviction and sentence and in which he presents five issues for our consideration. In addition to the brief of counsel, we have for our consideration a pro se brief, in which appellant argues, as does his attorney in his brief, that the evidence was insufficient to justify a conviction. In appellant's pro se
brief, the position is also taken to the effect that he did not receive effective assistance of counsel, which contention we will discuss after we have discussed the issues on appeal as to which appellant and his counsel are in agreement. In doing so, we will endeavor, of course, to give due consideration also to the brief of the appellee's counsel.
The position is taken in the brief of counsel for appellant and in appellant's pro se brief that the evidence was insufficient to support the verdict that defendant was in possession of cocaine. In neither brief is the contention made that the substance which defendant was charged with possessing was not proved to be cocaine, it having been shown by the testimony of expert witnesses that it was, particularly the testimony of Mr. Ronald D. Hubbard, a forensic laboratory analyst and drug chemist with the Alabama Department of Forensic Sciences, from whose testimony we quote the following:
 "Q. You had how many other small envelopes that you tested for white powder, and got results of cocaine?
 "A. I had six small envelopes, paper envelopes, and then there was a plastic bag that had some white powder in it that proved to contain cocaine hydrochloride and mannitol.
 "Q. And that plastic bag, were you able to weigh that amount?
"A. Yes. That was the 0.204 gram.
 "Q. What did you do with those items once you finished your test?
 "A. After I was through, I put them back in the envelopes that I received them in, resealed them, and placed them in our evidence room.
"Q. What happened to them from that point?
 "A. It was returned to Officer Thomas M. Bradley, on July the 6th of this year.
 "Q. Were the envelopes sealed when you placed them in that locker?
"A. Yes, sir, they were.
 "MR. WARREN [Assistant D.A.]: State moves to introduce State's Exhibit Number 10 into evidence.
 "MR. SEMMES [Defendant's attorney]: Judge, I would like to look at it before — Judge I raise the same objection of those as I did on 3 through 8 or 9. *Page 1228 
 "THE COURT: All right. It will be overruled, be admitted in.
 "MR. WARREN: Those are all the questions I have of this witness. "THE COURT: Cross-examine."
According to the testimony of witnesses called by the State, the substance determined to be cocaine was found in the execution of a search warrant upon the residence of one that they thought was Garfield Heath, a brother of defendant, but which Alvea Marie Gray, a witness for defendant, was occupying and apparently was in charge of at the time of the search, and at which time several other persons were present. We quote the following parts of the testimony of Alvea Marie Gray:
 "Q. All right. Did the police come to your house that day?
"A. Yes.
"Q. Okay. Do you remember about what time?
 "A. No. It was about five [in the afternoon], I don't know exactly.
"Q. What did they find in your house?
 "A. They say they found cocaine, and a pipe, and butane gas [items used in the smoking of cocaine], things that I had on the table.
"Q. Okay. They found some scales and some other things?
"A. Yeah.
". . . .
 "Q. Okay. How long — or did Larry Heath come to your house that day?
"A. Yes.
 "Q. How long was he in the house before the police came to the door?
"A. One or two minutes.
"Q. Okay.
"A. Not over five minutes.
 "Q. Okay. Would it be safe to say that he had just arrived at your house?
"A. Right.
"Q. Now, whose cocaine and things were they?
"A. They were mine. The cocaine belonged to me.
"Q. It belonged to you?
"A. Right.
"Q. Okay. Larry Heath lived at your house?
"A. No.
 "Q. When he came to your house, did he go any place other than the kitchen?
"A. Not to my knowledge, he didn't.
"Q. Okay. So, the cocaine was yours; is that correct?
"A. Right.
 "Q. Did you at any time tell Larry Heath that there was cocaine in the house that day?
"A. No.
 "Q. To your knowledge, did he know that there was cocaine in the house?
"A. No.
 "Q. Okay. Now, you pled guilty to this charge yesterday afternoon; didn't you?
"A. Right.
 "Q. Okay. And you have a bargain with the State of Alabama, is that correct, as far as the sentence you were going to get?
"A. Right.
"Q. Okay. You any kin to Larry Heath?
"A. No.
 "Q. Did you tell the police at any time when they were there that the cocaine was yours?
 "A. Yes. Mike Hembree made a statement about something that was in the house, who did it belong to. And I told him everything in the house belonged to me. And he said, `The dope, too?' and I said `right.'"
On cross-examination by the State, the witness testified in part as follows:
"Q. Ms. Gray, you were living at the Garfield Heath residence in March; is that right?
"A. No, it wasn't Garfield's — I was living there. Garfield Heath didn't live there.
". . . .
"Q. Garfield Heath wasn't living there? *Page 1229 
"A. No. We was going together. He stayed over, but Garfield's residence was at his mother's.
"Q. Do you know the relationship between the defendant Larry Heath and Garfield Heath?
"A. They are brothers.
"Q. Did Larry Heath visit there very often?
"A. Yes, he came to visit.
"Q. How long was he there before the police arrived?
"A. It wasn't five minutes.
"Q. Where was he the whole time he was there at your house?
"A. I can't say where he was, but he had just walked in the house. And when you enter the house you come through the kitchen, and at the time he was in the kitchen.
"Q. All right. But he could have been in another room as far as you know?
"A. As far as I know he was in the kitchen, and that's as far as I know. Because he had just entered the house.
"Q. What I am saying is you saw him with your own eyes the whole time he was there?
"A. I didn't see him the whole time he was there.
"Q. He could have gone in another room?
"A. Yeah, he could have.
"Q. Do you know how he arrived at your house?
"A. I think him and Henry Gaston came there together.
"Q. So, Gaston was there the same length of time?
"A. Uh-huh (affirmative).
"Q. How long had you had the plastic bag with the cocaine on the kitchen table?
"A. I didn't — I was smoking cocaine, when the incident occurred. I didn't have no plastic bag with cocaine in it on the kitchen table.
"Q. You didn't have it there?
"A. What I had — I was at home and I was smoking cocaine. Wasn't nobody in the house but me. I looked out and I seen Garfield fixing to come in. And when I seen him, I tried to hide the cocaine.
". . . .
"Q. And then when you saw Garfield Heath, that's when you put it under the bed?
"A. I tried to hide the cocaine because I was in there smoking and he had gotten on me about smoking cocaine.
". . . .
"Q. Were there any kind of envelopes around there with cocaine in them?
"A. No, wasn't anything — wasn't nothing — only cocaine was on the plate. I had some small bags — I was fixing to bag the cocaine, what I wanted to take with me, I was going to take the cocaine with me. I put it in the small bags when I leave home and want to take it with me. Okay. Those were on the table. There wasn't any cocaine in the house in no bags.
"Q. You're saying the cocaine was in envelopes on the table?
"A. No. What I'm saying, I had the cocaine on the table on the plate. I was smoking at the time. I had all the cocaine on the plate.
"Q. Okay. The cocaine in the envelopes plus the cocaine in the water pipe.
"A. I didn't have the cocaine in any envelopes. I don't know where they came from. They came —
"Q. — What was the cocaine that you had in?
"A. It was on the plate.
"Q. Just out plain, just out — Not in any containers?
"A. No, because — I don't know. I had a sifter and I had just sifted the cocaine.
"Q. What did you get the cocaine out of to sift?
"A. To sift? A large plastic bag, which I had got rid of. *Page 1230 
"Q. What did you do with that plastic bag?
"A. I balled it up and throwed it in the trash and they didn't find it. They didn't get that bag, but they went in my bedroom. They made me sit in the kitchen and no one but them went in the bedroom and closed the door. And when they came out they had found the cocaine.
"Q. Are you saying the police planted that cocaine in those envelopes in your bedroom?
"A. I don't know where it came from, but I didn't have any cocaine in my bedroom in an envelope.
"Q. Did you give any cocaine to Garfield Heath while he was there?
"A. No, I didn't. Garfield didn't know the cocaine was in the house until when I looked out and said, `Police, police.'
"Q. And then what did he do to your knowledge?
". . . .
"A. I don't know, because I was standing at the door, you know. But I pointed out to him that I had cocaine.
"Q. When is the next time you saw Garfield Heath after the police arrived and you yelled to him?
"A. The next time?
"Q. Yeah.
"A. In jail.
"Q. You never saw him again at the house?
"A. What are you saying, when's the next time?
"Q. After you saw the police arrive and you yelled out `Here's the police,' or whatever, when's the next time you saw Garfield Heath in the house?
"A. In the house?
"Q. Right.
"A. When they come out — when they come in and told all of us to come in the kitchen.
"Q. Was he in the kitchen the whole time?
"A. I don't know, because I was standing at the door. I was standing up against the door.
". . . .
"A. I was standing right here in the door. This is all the kitchen. The bedroom was over here. I don't know how this is drawed out. But the bedroom was right over here next to the kitchen. I'm up against the door. I couldn't see that, cause I'm standing up against the door. I couldn't see if Garfield was in the bedroom or up in the kitchen or where he's at because the bedroom was right next to the kitchen.
"Q. All right. Where was Larry Heath at the time?
"A. At that time, I'm telling you, I was up against the door.
"Q. So, you don't really know where he was?
"A. I don't know. But Larry, he had just entered so I'm sure he was in the kitchen. Because he had just entered the house.
". . . .
"Q. What were you going to put the cocaine in to take it out of the house?
"A. I had some small aluminum bags.
"Q. Aluminum?
"A. Not aluminum, like wax paper bags.
"Q. Show you State's Exhibit Number 9. Would these be those type bags (indicating)?
"A. Yes.
"Q. And you testified earlier that you hadn't put any cocaine in any of these bags?
"A. No.
"Q. And you didn't have any cocaine in these bags anywhere in your house?
"A. No.
"Q. Is this sifter the same one you had, State's Exhibit Number 6?
"A. Yes.
"Q. Did you find your plate under the bed later on? *Page 1231 
"A. I don't know. I didn't go back there looking for it. I went to jail.
". . . .
"Q. When did you tell Officer Hembree that everything there was yours?
"A. He went in and he found a shotgun. And he asked who the gun belonged to. And I told him it was mine. I told him everything in the house was mine.
"Q. All right. Is this after he read you your Constitutional rights?
"A. Yes.
"Q. Ms. Gray, isn't it true that just because you pled yesterday, you['re] taking the rap for all these other people today?
"A. No, [it's] not true, because I had took the rap even though — no.
"Q. You would have taken the rap even though what?
"A. It was my drugs.
"Q. None of these other people were there smoking it, using it or anything?
"A. No.
"Q. Did any of them have access to it?
"A. No.
"Q. So, none of them could have gone over there and picked it up or anything?
"A. I told where it was at.
"Q. You told who where it was at?
"A. I just hollered, `The police.' And I put it under the bed and told them get the cocaine because I had put it under the bed.
"Q. Okay. And you don't know what happened to it?
"A. No.
"Q. Your testimony is that that was not Garfield Heath's residence?
"A. Garfield had his things there, but Garfield at the time still had a wife. We was going together. He stayed there, but Garfield's residence was with his mother. He stayed there at night sometimes.
"Q. He had clothing there?
"A. Yeah, he had some clothing there.
"MR. WARREN: Those are all questions I have.
 "REDIRECT EXAMINATION
"BY MR. SEMMES:
"Q. Larry Heath didn't stay over there; did he?
"A. No.
 "Q. And how long did he — was he in the house, as far as you know, before the police came?
 "A. I told you, it wasn't over five minutes that he was there.
"MR. SEMMES: That's all the questions I have.
"MR. WARREN: No further questions.
"THE COURT: Thank you, ma'am, you can step down.
"MR. SEMMES: Judge, that's all I have. We rest.
"THE COURT: Defense rests. Any rebuttal?
 "MR. WARREN: State has one more witness who might be down the hall."
The State then called Officer Harnen as a rebuttal witness. We quote in part some of his testimony in rebuttal:
"Q. Where was that shotgun?
 "A. It was beside the bed in the bedroom which is noted on the right lower corner (indicating to blackboard).
 "Q. You talking about this one, the same one the cocaine was found in?
"A. Correct.
 "Q. At any time did you hear anyone claim that shotgun?
"A. No one would claim the shotgun.
"Q. And what happened to that shotgun?
 "A. It was put up for abandoned property, and it's now at the Anniston Police Department.
 "Q. At any time did you ever as evidence man see a plate with cocaine in it at that residence?
"A. No, I did not.
". . . .
 "Q. Do you have any firsthand knowledge as to whether the underside of that bed was searched?
"A. Yes. *Page 1232 
 "Q. All right. And what was the result of that search?
"A. I found nothing under there.
 "Q. How far is that bed from the one packet of cocaine that you marked on the board?
"A. Probably two feet, maybe.
 "Q. From that point, would you be able to look under that bed?
"A. Yes.
 "Q. When you went to the bathroom where Garfield Heath was, what if any kind of container did you see that might have had those envelopes of cocaine in them?
"A. I don't recall one at this time."
On cross-examination by defendant's attorney, Officer Harnen testified in part as follows:
 "Q. You weren't with Alvea Gray the whole time that you were in the residence; were you?
"A. No, I wasn't.
 "Q. Okay. So, she had the opportunity to speak to other police officers in the area; is that correct?
"A. That's right.
 "Q. And isn't it possible that she could have claimed that stuff by speaking to some other police officer and not you?
"A. That's possible.
". . . .
 "Q. She could have claimed the other items, is that correct, to some other police officer?
"A. I would say she could have."
Officer Michael Hembree of the Anniston Police Department also testified as a witness called by the State in rebuttal. His testimony on direct examination was as follows:
 "A. Initially, when we got to the residence I was with Sergeant Acker, and we were at the back door. People — once we entered the residence, I was what we call the `people person', keeping everybody at one location, keeping an eye on them.
". . . .
 "Q. Do you remember which room you kept the people in?
"A. Yes, sir; in the kitchen.
 "Q. Do you know who read the people their Constitutional rights at that time?
"A. I did.
"Q. Do you remember a shotgun being found?
"A. Yes, I do.
". . . .
 "A. Garfield and the rest said they had never seen it before.
"Q. Garfield and who said that?
 "A. Nobody would claim ownership of it. Garfield, he told us he had never seen it before.
 "Q. Was Alvea Gray present when that question was asked?
"A. She was.
"Q. Did she specifically make any reply?
"A. She didn't make any reply.
"Q. Do you know what happened to that shotgun?
 "A. We seized it. It was a legal, sawed-off pump twelve gauge. It was not illegal for anybody to possess. We seized the shotgun.
 "Q. Did anybody make a statement concerning ownership of any white powder or cocaine found at the residence?
 "A. There were no statements made concerning ownership of it. Garfield Heath made a statement that, `We were just fixing to smoke', in reference to cocaine.
". . . .
 "Q. Who transported the people who were arrested to the Anniston Police Department?
"A. Uniformed patrol car that we called out.
 "Q. Were you ever present when anybody admitted owning the cocaine that was seized?
"A. No.
 "Q. At any time did you ever see a plate containing cocaine on it?
 "A. There could have been a plate on the table, but it was just set up with a big number of small celophane bags, *Page 1233 
what we would call quarter bags, or sifters and butane and grinding equipment for putting it in the bags. It could have been on a plate, because it's generally bagged up over some kind of something to catch what's missed."
On cross-examination by defendant's attorney, Officer Hembree testified as follows:
 "Q. Did — were you with Alvea Gray the whole time in that residence?
"A. Majority of the time.
"Q. The whole time? Any time she was not with you?
 "A. There was probably just a minute or so maybe I stepped back into the bedroom toward the end of the search.
 "Q. All right. Toward the end of the search. So, there is a possibility she could have talked to some of the other police officers while you were not there?
"A. It's possible."
Mr. Charles Winfrey, an investigator for the District Attorney's Office, was the first witness on the trial of the case. He testified:
"Q. What type room did you enter?
 "A. It was a small kitchen. We went in through the kitchen door and it was a kitchen.
 "Q. Where was the defendant located in that room when you first saw him?
 "A. He was sort of jumping around and backing away from the kitchen table there at the time we went in.
 "Q. Approximately how far from that table was he at that time?
 "A. Several feet, two or three foot, backing away, backing up, running, trying to run.
"Q. What did you do next?
"A. I grabbed hold of him.
 "Q. Where were the other people standing in the room when you first noticed them?
 "A. There was an individual by the name of Elston, he was standing to my right almost up against a wall. The defendant, he was directly in front of me to the right of the kitchen table. And I don't remember where the female was at the time. We had pushed her back.
 "Q. What, if anything, unusual sounds were going on when you entered the room?
 "A. As soon as we got in, Harnen came in just about simultaneously as I did, and we heard the commode flushing, which would be off to our right through a door to our right.
"Q. What happened then?
 "A. I was holding this defendant, and Officer Harnen ran for the bathroom.
"Q. What happened after that?
 "A. I heard some commotion in the bathroom, about the same time I noticed another individual coming out of the bedroom.
". . . .
"Q. All right. What happened after that?
 "A. Harnen come back out of the bathroom with — or someone went in the bathroom and got Garfield Heath out and brought him out.
"Q. Who was evidence man on this search?
"A. Officer Harnen was the evidence man.
". . . .
"Q. Was there a search performed of this residence?
"A. Yes, sir.
 "Q. And what part of that residence, if any, did you search?
 "A. I searched the — I guess it would be the main bedroom off to the right — off to the left was the bathroom where I noticed the individual coming out of.
"Q. And what, if anything, did you find in that room?
 "A. I found one packet, small manila packet containing white powder laying in front of a nightstand beside the bed. Also behind the chest of drawers in the corner of the bedroom, I found it was either five or six packets of white powder that had been put behind the chest of drawers. *Page 1234 
"Q. All right. What pattern was there on the floor.
 "A. They were just scattered around, behind — the chest of drawers was sitting catty-corner in the corner. And they were on the floor just in no certain stack or anything, just scattered.
"Q. Did you call Officer Harnen as the evidence man?
"A. Yes, sir.
"Q. What did he do in your presence?
 "A. He came in and made notations of the time, and who found it, and then took pictures, and took control of the package.
 "Q. What, if anything, else did you find in the residence?
 "A. Other than the — seeing the white powder on the kitchen table, that's all I found.
The only person, other than Ms. Alvea Gray, that was called to the stand as a witness by defendant was Henry Jerome Gatson, Jr., who promptly declined to testify in the case, stating, "I take the Fifth."
After considering the evidence as shown by the transcript, the conclusion is reached by the writer hereof that a jury question was presented as to the guilt of the defendant.
By another issue presented in brief of counsel for appellant, the contention is made that the test of "totality of circumstances" as set forth in Illinois v. Gates, 462 U.S. 213,103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), for the execution of a valid search warrant was not met in the instant case in that "the informer had only given information in one previous case which led to an arrest, but not a conviction some one to two years previously." The reference is apparently to the part of the testimony of Officer Harnen on cross-examination by defendant's attorney as follows:
 "Q. Okay. Now, you stated in the affidavit that you had received information from a `confidential and reliable informant who had given me information in the past, which has proven to be true and correct.' Which cases has the informant given you information?
 "A. This informant gave me information on the case involving Charles — Charles Louis Taylor and Edward Taylor. It resulted, it was after this case — and it resulted in the arrest of three persons.
 "Q. Have they been convicted at all, to your knowledge?
 "A. All but one has been convicted, the other one is still pending.
"Q. Is that all in one case?
"A. Yes.
 "Q. Did he give you — what about any other case he's given you information on?
"A. That's it.
"Q. Just one case, is that all?
"A. Yes, sir."
We are not convinced that the particular issue now under consideration is well taken and we determine it adversely to appellant.
The final issue presented by appellant's attorney is thus stated in his brief:
 "WHETHER THE TRIAL COURT ERRED IN OVERRULING THE MOTION FOR A NEW TRIAL WHERE THE JURY IN THEIR DELIBERATIONS TOOK INTO ACCOUNT THAT THE DEFENDANT DID NOT TAKE THE STAND CONTRARY TO THE INSTRUCTIONS OF THE TRIAL JUDGE?"
The issue is directed at the action of the trial court in overruling defendant's motion for a new trial whereby defendant's attorney endeavored to show by the testimony of one of the jurors on the trial of the case that he or some of the other jurors had taken into consideration adversely to defendant the fact that he had not taken the stand as a witness. The concluding part of the testimony of the juror on direct examination by defendant's attorney on the hearing of the motion for a new trial was as follows:
"A. No, I didn't comment on it.
 "Q. Not you, but do you remember any of the other jurors bringing up the fact that Mr. Heath did not take the stand?
"A. No one commented on it. *Page 1235 
"Q. Okay. Was it brought up, was the fact brought up?
 "A. One juror said he wondered why he wasn't on the stand, and that's all that was said.
 "Q. Was there anything else said concerning the fact that he may have had prior convictions?
"A. No.
 "Q. Did the jury base its decision, if you know, on the fact that he did not take the stand?
"A. They did not.
 "Q. Okay. There was no more discussion other than that one point.
"A. That's all I remember of — hearing."
We determine the final issue presented in brief of counsel for appellant adversely to appellant.
In appellant's handwritten, but clearly legible, lengthy pro se
brief, appellant argues some of the same or similar issues presented in brief of counsel, which we have discussed above. In addition, appellant in his pro se brief endeavors to have this Court determine whether he has been afforded effective assistance of counsel, which he, throughout his pro se brief, insists that he did not receive, and as to which he refers in particular to items which appellant contends constituted a failure of his counsel to render effective assistance. We now remind appellant that this Court is an appellate court and that it is not a part of its right, duty, or function to determine the issue as to whether he has received effective assistance of counsel unless and until that issue has been presented to the appropriate trial court for its determination and this Court is called upon to review the trial court's determination of the issue. Therefore, we respectfully decline at this time to determine whether appellant's attorney has rendered him effective assistance.
The judgment of the trial court should now be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All Judges concur.